UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER FINK-CARVER, et al., | Case No. 21-cv-00664-JSW |
| Plaintiffs, | |
| v. | **ORDER RESOLVING CROSS-MOTIONS FOR SUMMARY JUDGMENT; SETTING FURTHER CASE MANAGEMENT CONFERENCE** |
| POLICE OFFICER KUHN, et al., | |
| Defendants. | Re: Dkt. Nos. 47, 51 |

Now before the Court for consideration are the cross-motions for summary judgment, filed by Plaintiffs Jennifer Fink-Carver ("Carver") and Jason Fink ("Fink," and collectively, "Plaintiffs") and Defendants City of Pleasant Hill ("City") and Police Officer Kuhn ("Kuhn," and collectively, "Defendants"). The Court has considered the parties' papers, relevant legal authority, and the record in this case, and it finds the matter suitable for disposition without oral argument. *See* N.D. Civ. L.R. 7-1(b). For the following reasons, the Court GRANTS IN PART AND DENIES IN PART Plaintiffs' motion and GRANTS IN PART AND DENIES IN PART Defendants' motion.

## BACKGROUND

**A.    Carver.**

In the evening of May 9, 2020, Carver placed a call to 9-1-1 to ask for assistance in removing her fiancé Gary Armas ("Armas") and his daughter ("Brooke") from the Pleasant Hill home where Carver and Armas resided. (Dkt. No. 48, Def.'s Ex. A-1, Carver 9-1-1 audio recording.) Carver informed the dispatcher that Brooke had entered the home to confront Carver over giving Armas a black eye, but Carver denied touching Armas. (*Id.* at 00:16-00:58.) While Carver placed her call, Brooke called 9-1-1 as well. Brooke told the dispatcher that Carver had

United States District Court
Northern District of California

1  punched Armas in the face and that he had a black eye.  (Dkt. No. 48, Def.'s Ex. A-2, at 00:14-

2  00:28.)  A brief verbal confrontation between Armas and Carver can be heard in each 9-1-1

3  recording, but Brooke and Armas were otherwise situated outside of the house while Carver was

4  inside.  (*Id.* at 1:07-1:38; Def.'s Ex. A-1 at 1:55-2:20.)

5      Officer Garcia arrived at the scene and spoke to Brooke and Armas in the driveway.  (Dkt.

6  No. 48, Def.'s Ex. C, Garcia body-worn camera ("BWC") at 00:30.)  Armas informed Garcia that

7  Carver had hit him the night before, and that no physical altercation had occurred that day.  (*Id.* at

8  00:57-01:45.)  Armas told Garcia that he wanted to "get his stuff and go," but that he was unable

9  to do so while Carver was inside the house.  (*Id.* at 02:32-02:40.)  Armas confirmed that he and

10  Carver resided together at the house and that they were in an intimate relationship.  (*Id.* at 02:53-

11  03:18.)

12      In describing the previous day's altercation, Armas told Garcia that he had asked Carver

13  for something that she did not like, and that she reacted by hitting Armas over the head with her

14  fist, television remote, and cordless phone four or five times.  (*Id.* at 07:33-08:10, 10:05-10:10.)

15      While Garcia interviewed Armas, he observed Carver inside the house through the

16  window.  According to Garcia, "Carver walked to the front door, shut it and appeared to lock it."

17  (Dkt. No. 55-1, Pl.'s Ex. S, Garcia Rpt.)

18      Also while Garcia interviewed Armas, Officer Johnson, another officer then on the scene,

19  interviewed Brooke.  After the interview, Johnson radioed, "It's going to be a 415 over a domestic

20  that occurred last night."  (Dkt. No. 48, Def.'s Ex. G, Johnson BWC at 03:15-03:22.)  Johnson and

21  another officer then approached the front door to the house and knocked.  (*Id.* at 07:43.)  Johnson

22  knocked and announced, "Jennifer, it is the police department, can you answer the door please?"

23  He then knocked two more times, and he again stated that "it is the police department" and asked

24  Carver to come to the door.  (*Id.* at 07:43-08:20.)  Johnson also went to the living room window

25  and knocked again.  (*Id.* at 08:40-08:50.)

26      Johnson then approached Armas and asked if there were any firearms in the house.

27  (Johnson BWC at 09:00-09:02.)  Armas confirmed that Carver possessed a firearm.  (*Id.* at 09:03-

28  09:09.)  Armas then volunteered, "Do you want me to let you in?" while pulling out his keys.  (*Id.*

at 09:09-09:10.)  Johnson replied, "Uh, if you could just give me the key, that would be great."
(*Id.* at 09:11-09:15.)  Armas handed Johnson the house key.  (*Id.* at 09:15-09:20; Garcia BWC at
09:32-09:43.)

Key in hand, Johnson again knocked on the window.  (Johnson BWC at 09:40.)  Hearing
no response, Johnson entered the gate, approached the front door, unlocked the door and the
deadbolt, and swung the door open.  (*Id.* at 10:00-10:35.)  Johnson walked back to the gate,
informed another officer that the door was open, and then reapproached the front door, which had
re-closed.  He again opened the door and called out to Carver twice to announce herself and come
speak with the police.  (*Id.* at 10:50-11:40.)  Defendant Kuhn arrived at the entrance to the home
with his police canine, Bodie, and also called out for Carver.

A minute later, Johnson again called out to Carver and asked her to come out to the door.
(*Id.* at 13:15.)  Johnson then knocked on the neighbor's door, and the BWC shows his gun was
drawn.  (*Id.* at 13:40-13:55.)  Johnson waited another minute, and then called out to Carver twice
more.  (*Id.* at 14:35-14:52.)

During this time, Armas dialed Carver and handed his cell phone to Officer Garcia.
(Garcia BWC at 13:54-14:30.)  Garcia asked Carver if she could come to the front door so they
could talk, and Carver hung up on Garcia rather than respond.  (*Id.*)  Johnson and Garcia
conferred, and Garcia told Johnson that it sounded like Carver was "under something . . . or . . . in
a closet" while on the phone.  (*Id.* at 15:33-15:40.)

Garcia then solicited more information about the firearm from Armas and learned that it
was likely loaded.  (*Id.* at 15:41-16:23.)  Armas informed Garcia that Carver would not use the
firearm.  (*Id.*)

A minute later, Kuhn announced to the open door, "Pleasant Hill Police Canine, come out
with your hands up."  (Dkt. No. 48, Def.'s Ex. I, Kuhn BWC at 01:20-01:23.)  At this point,
Carver could be heard speaking, but her words are unclear on the BWC footage.  Kuhn responded,
"Come out with your hands up, hands straight up, come out."  (*Id.* at 01:30-01:35.)  After a brief
pause, Kuhn again stated, "Pleasant Hill Police Canine, come out with your hands up."  (*Id.* at
01:40-01:43; Johnson BWC at 16:02.)  Bodie barked at the open door.  (Kuhn BWC at 01:42.)

United States District Court
Northern District of California

1   Kuhn again stated, "Come out with your hands up," and Johnson stated, "Come out." (*Id.* at

2   01:46-01:51.) Johnson had his gun drawn and pointed into the front room. (Johnson BWC at

3   16:23.)

4       At this time, Carver walked into the front room. Kuhn and Johnson told Carver, "Walk

5   towards us." Carver responded, "I didn't do anything." Bodie barked at the sight of Carver, and

6   the officers repeated that Carver should "come outside." (Kuhn BWC at 01:55.) Johnson and

7   continued to point his firearm at Carver.

8       Carver held her right hand to her face and was holding a cell phone, which was lit up as if

9   on a phone call. (Kuhn BWC at 01:58-02:01) Her left hand was empty at her side. (*Id.*) Carver

10  was wearing gray sweatpants and a gray short-sleeved shirt that flared out slightly at the hips.

11  (*Id.*) She approached the front door and paused at the threshold, stating that she did not do

12  anything while the officers ordered her to come out. (*Id.*)

13      At 16 minutes, 33 seconds into Johnson's BWC video, Carver took a step backwards. At

14  that instant, Johnson was through the screen door and moving into the front room, but it is unclear

15  if the officers rushed Carver before or after she began to retreat. By 16 minutes, 34 seconds,

16  Carver had taken several hops backwards as Johnson closed in on Carver, several feet inside the

17  house, while Carver said, "Excuse me." Five officers entered the house within five seconds, with

18  Kuhn entering last: Johnson, Leonard, Garcia, Gartner, and Kuhn. (Kuhn BWC at 02:04-02:09)

19      At 16 minutes, 36 seconds into Johnson's BWC video, Johnson brought Carver down onto

20  the couch. Carver braced herself with her empty left hand, while her right hand, still holding the

21  phone, was folded under her stomach. Garcia pressed his weight on Carver's back, pinning her

22  down with his left hand while grabbing onto her left arm with his right hand. (Garcia BWC at

23  17:00-17:26.) Carver shouted, "Why" repeatedly, while Johnson and Garcia told Carver to bring

24  her hands behind her back. At 16 minutes, 42 seconds, Johnson and Garcia both had grabbed onto

25  Carver's left arm and were pulling it behind her back. At 16 minutes, 44 seconds, Gartner had

26  grabbed Carver's right arm and was attempting to pull it out from under her body. (Dkt. No. 48,

27  Def.'s Ex. K, Gartner BWC at 09:43-09:46.) Carver was stomach-down on the couch, with her

28  knees on the floor, being held by three police officers. A fourth officer, Sergeant Leonard,

United States District Court
Northern District of California

1    handcuffed Carver's left wrist and was reaching to grab Carver's right arm.  (Dkt. No. 48, Def.'s

2    Ex. M, Leonard BWC at 02:14-02:16.)  At 16 minutes, 45 seconds, Carver screamed "ow, okay."

3         Then, Bodie bit Carver's thigh.  At 16 minutes, 50 seconds, still screaming, Carver yelled,

4    "ow, the dog. Oh my god, the dog is killing my leg."  The officers clicked the handcuffs on Carver

5    at 17 minutes, 0 seconds.  At 17 minutes, 3 seconds, Johnson's video shows Bodie no longer

6    latched onto Carver's leg.  Bodie bit Carver's leg for a total of eleven seconds.  (Kuhn BWC at

7    02:14-02:26.)

8         The officers then swept the house, calling out for anyone else to make themselves known.

9    They entered Carver's bedroom, and Johnson located Carver's firearm under her mattress.

10   (Johnson BWC at 17:49-18:24.)  Johnson then removed the clip and began taking the firearm

11   apart.  (*Id.*)

12        After briefly checking with other officers in Carver's bedroom, Kuhn left the house to

13   return Bodie to his car.  (Kuhn BWC at 03:05-03:25.)

**B.    Fink.**

15        At some point prior to Fink's arrival on the scene, Carver called Fink and Fink instructed

16   Carver to stay in the house and not talk to the police until his arrival.  Fink arrived at Carver's

17   house less than two minutes after Carver's arrest.

18        Kuhn's BWC video shows that Fink ran past Kuhn and Bodie towards the house wearing

19   gym shorts and a hoodie.  (Kuhn BWC at 03:43.)  Kuhn did not react or tell Fink to stay away.

20   (*Id.*)

21        When Fink reached the doorway of the house, Gartner shouted for him to back up.

22   (Gartner BWC at 11:20.)  Fink responded, "This is my sister's house."  (*Id.* at 11:23.)  Fink took

23   backwards steps, first pointing his arm into the house and then raising both of his arms as Gartner

24   pushed against Fink's chest.  (*Id.* at 11:24-25.)  It is unclear from the video if Fink pushed against

25   Gartner, but within seconds, Fink raised his arms to the side, palms out, in a surrender posture.

26   (*Id.* at 11:28.)  Fink kept his arms out as Gartner pressed his palm into Fink's chest, pushing Fink

27   into the yard.  (*Id.* at 11:28-11:30.)  Gartner instructed Fink to "put [his] hands behind [his] back"

28   and started to turn Fink around.  (*Id.* at 11:30.)

United States District Court
Northern District of California

Gartner's BWC deactivated at this point, but Leonard's BWC video shows Gartner and Leonard attempting to handcuff Fink. (Leonard BWC at 04:05.) The two officers flanked Fink and pushed him onto his knees, and Fink twisted his torso and arms away to avoid the handcuffs. (*Id.* at 04:05-04:12.) Fink retreated into his hoodie and tried to press his hands into the grass while the officers yelled, "Hands!" (*Id.*)

The shouting prompted Kuhn and Bodie to turn around and head back to the house. (Kuhn BWC at 03:50.) When Kuhn reached the gate, Fink was standing in the yard with his hands up as Gartner and Leonard continued to approach. (*Id.* at 04:04.) Kuhn saw Gartner and Leonard go to either side of Fink, grab Fink's arms, and push Fink to his knees. (*Id.*) Kuhn saw Fink resisting and Fink's hoodie coming up. (*Id.* at 04:09.) Bodie barked as Kuhn approached, but Kuhn did not announce that he would use the canine if Fink did not comply. Instead, within seconds of Fink being pushed to his knees and him digging in with his hands to evade the cuffs, Kuhn had Bodie bite Fink's exposed abdomen. (*Id.* at 04:10.) Fink screamed. (*Id.*) Bodie held on until the officers grabbed Fink's hands, but released before they were fully cuffed. (*Id.* at 04:26.) Bodie bit Fink for a total of 16 seconds. (*Id.* at 04:10-04:26.)

The Court will address additional facts in its order as necessary.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint against Officer Kuhn, the City of Pleasant Hill, and Does 1 through 20 on January 27, 2021. (Dkt. No. 1.) Based on the foregoing allegations, Carver and Fink seek relief for the following claims: (1) violation of Fourth Amendment rights through 42 U.S.C. Section 1983 for unreasonable force, unlawful seizure, and unlawful arrest as against Kuhn; (2) supervisory liability under *Monell* against the City; (3) negligence against all Defendants; (4) assault against all Defendants; (5) battery against all Defendants; and (6) violation of civil rights under the Bane Act, California Civil Code Sections 52, 52.1.

In October 2022, the Court granted Defendants' motion to bifurcate trial and discovery of individual liability claims from the *Monell* and supervisory liability claims. (Dkt. No. 29.)

The parties now cross-move for summary judgment.

United States District Court
Northern District of California

**ANALYSIS**

Kuhn asks the Court to make a finding that, as a matter of law, his use of the canine was objectively reasonable. Such a finding would require dismissal of Plaintiffs' Fourth Amendment and state law claims relating to use of force. Kuhn also asserts that his warrantless entry into Carver's residence was lawful. Finally, Kuhn contends that, if his conduct was unlawful, he is nevertheless immune from liability for the Fourth Amendment claims via qualified immunity.

Carver cross-moves for partial summary judgment on the basis that the entry into her home and her arrest therein was unlawful, and that the subsequent seizure of her firearm was unlawful. Fink moves for partial summary judgment on the basis that his arrest was unlawful.

**A.      Legal Standard on Motion for Summary Judgment.**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it may affect the outcome of the case. A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court views contested evidence in the light most favorable to the nonmoving party. *Johnson v. Barr*, 73 F.4th 644, 647 (9th Cir. 2023). If the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the Court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014).

**B.      Evidentiary Issues.**

**1.      Plaintiffs' Objections.**

Plaintiffs object to Defendants' Exhibits A-2 and E on the basis that the exhibits are irrelevant and duplicative. Defendants respond that Exhibits A-2 and E are relevant to the lawfulness of Plaintiffs' arrests. The Court agrees with Defendants that Exhibit A-2 is relevant to the lawfulness of Plaintiffs' arrests, and it OVERRULES the objection to Exhibit A-2 on that basis. The Court concludes that Exhibit E is irrelevant to any material issue. The Court

SUSTAINS Plaintiffs' objection as to Exhibit E.

Plaintiffs object to Exhibit R-12, R-13, and S on the basis of hearsay and best evidence. Exhibits R-12, R-13, and S are demonstratives and do not constitute evidence. Accordingly, the Court OVERRULES the objection to those exhibits.

Plaintiffs object to Exhibit Q-2, the expert report of Brad Smith, as to opinions number one through six. Plaintiffs assert that evidence relating to "modern police practices and standards" and K9 policies is barred by the Court's bifurcation order. The Court did not rely on Opinions 1 or 2, and therefore OVERRULES AS MOOT Plaintiffs' objections to those opinions. The Court SUSTAINS IN PART AND OVERRULES IN PART Plaintiffs' objections to Opinions 3 through 6, without prejudice to Plaintiffs submitting a later motion to exclude Mr. Smith's opinions under Federal Rule of Evidence 702. The Court disregarded any legal argument or conclusions contained in Opinions 3 through 6 in resolving the pending motions.

Plaintiffs object to paragraphs 3 through 9 of the declaration of Defendant Kuhn. The Court did not rely on any of the challenged language in the Kuhn declaration in order to resolve the motions. Accordingly, the Court OVERRULES AS MOOT Plaintiffs' objections to the Kuhn declaration.

Plaintiffs also object to paragraphs 4, 5, 8, 10, 12, 13, 14, 16, and 19 of Attorney Blechman's declaration, largely because of hearsay, best evidence, lack of foundation, and argumentativeness. The Court did not rely on any of the challenged language in the Blechman declaration in order to resolve the motions. Accordingly, the Court OVERRULES AS MOOT Plaintiffs' objections to the Blechman declaration.

## 2. Defendants' Objections.

Defendants object to the expert report of Thomas R. Butler on the basis that the opinions expressed in the report are beyond Mr. Butler's scope of expertise. The Court did not rely on Mr. Butler's opinions in resolving the motions, and therefore the objection is OVERRULED without prejudice to Defendants submitting a later motion to exclude Mr. Butler's opinions under Rule 702.

Defendants object to the expert reports of E. Thomas Barham on the basis that Mr. Barham

8

provides improper legal opinions and that his opinions are beyond the scope of his expertise.  The Court SUSTAINS IN PART AND OVERRULES IN PART Defendants' objections to Mr. Barham's testimony.  To the extent Mr. Barham provides legal opinions, the objection is sustained.  To the extent Defendants' objection is based on the scope of his expertise, the objection is OVERRULED without prejudice to Defendants submitting a later motion to exclude Mr. Barham's opinions under Rule 702.

Defendants object to Plaintiffs' Exhibits E and H, deposition transcripts of Mr. Smith from prior litigation, as irrelevant, unfairly prejudicial, and confusing the issues under Rules 401 and 403.  The Court agrees that the excerpted portions of the depositions are irrelevant and SUSTAINS the objections on that basis.

Defendants object to Plaintiffs' Exhibit F, an article by David Reaver regarding police dogs, on the basis that it lacks foundation and is irrelevant, confuses the issues, and is unduly prejudicial.  The Court agrees and SUSTAINS the objection.

Defendants object to Plaintiffs' Exhibit G, prior deposition testimony by Mr. Reaver in an unrelated case, on the basis that it lacks foundation and is irrelevant, confuses the issues, and is unduly prejudicial.  Defendants also object that Mr. Reaver is not an expert in this case and his opinions are improperly couched as expert opinions.  The Court agrees and SUSTAINS the objection.

Defendants object to Plaintiffs' Exhibit N, a combined exhibit of articles from Wicked Local.com and Ladies Home Journal, on the basis that the articles are irrelevant and lack authentication.  The Court agrees and SUSTAINS the objection.

Finally, Defendants object in whole to Plaintiffs' submission of Exhibits O, P, Q, and R in Dkt. No. 53 as untimely, irrelevant, and prejudicial.  Plaintiffs submitted Dkt. No. 53 more than two weeks after the deadline to submit their opposition and cross-motions for summary judgment. Plaintiffs did not seek leave to file additional non-legal authorities, or to file out-of-time.  The Court excludes the authorities on this basis and SUSTAINS Defendants' objection.

C.   **Kuhn Is Not Entitled Summary Judgment on Carver's Section 1983 Excessive Force Claim, But He Is Entitled to Qualified Immunity Regarding Fink's Section 1983 Excessive Force Claim.**

   1.   **A Reasonable Jury Could Find that Use of the Canine On Both Carver and Fink Constituted Excessive Force.**

   Kuhn argues that his use of his canine was reasonably necessary and objectively reasonable.  Use of a police dog in the context of an arrest is subject to excessive force analysis. *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994).  The Fourth Amendment protects one's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ."  "The 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out."  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  In determining reasonableness of use of force, a court must carefully balance the individual's Fourth Amendment interests against the countervailing governmental interests.  *Id.* at 396.

   The reasonableness of the particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with hindsight.  *Id.* at 396.  The reasonableness inquiry considers "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397.  The Court must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.  This determination is "ordinarily a question of fact for the jury," so, accordingly, "summary judgment should be granted sparingly."  *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1102 (N.D. Cal. 2017).

   a.   **The Intrusion on Plaintiffs' Fourth Amendment Interests Was Serious.**

   The Ninth Circuit has not determined if the use of a canine is necessarily deadly force. *Smith v. City of Hemet*, 394 F.3d 689, 707 (9th Cir. 2005).  Instead, it has stated that whether or not a canine constitutes deadly force depends on the facts of each case.  *Id.*  Deadly force is a force that creates a substantial risk of death or serious bodily injury.  *Id.* at 706.

   Use of Bodie was not deadly force in these circumstances.  Kuhn had Bodie on a leash and called him off within seconds.  Bodie bit Carver's thigh and Fink's abdomen, but he did not puncture any major organs or arteries.  *Cf. Lowry v. City of San Diego*, 858 F.3d 1248, 1257 (9th

United States District Court
Northern District of California

1  Cir. 2017) (finding dog bite did not constitute deadly force where it bit plaintiff's face because dog

2  was called off quickly and actual harm to plaintiff was moderate).

3        Nevertheless, there is no dispute that the dog bites resulted in substantial pain and injury to

4  Plaintiffs.  The Plaintiffs were bit and held by the canine for eleven and sixteen seconds.  The

5  body camera videos show Plaintiffs crying out upon being bitten, and both Plaintiffs required

6  medical attention.  Police photographs of Plaintiffs' injuries show bruising, blood, and bits of flesh

7  at the site of the bites.  (Dkt. No. 46-1, Def.'s Exs. L, O.)  As for Carver in particular, the

8  photograph shows significant avulsions where her flesh was ripped away from her thigh.  (*Id.*,

9  Def.'s Ex. L.)

10        The intrusion on Plaintiffs' rights was serious.  *See Miller v. Clark County*, 340 F.3d 959,

11  964 (9th Cir. 2003) (affirming finding that dog bite injury was "considerable"); *Chew v. Gates*, 27

12  F.3d 1432, 1441 (9th Cir. 1994) ("By all accounts, the force used to arrest Chew was severe.

13  Chew was apprehended by a German Shepherd taught to seize suspects by biting hard and

14  holding."); *Smith*, 394 F.3d at 701-02 (canine was at minimum "intermediate" force and "most

15  severe force authorized short of deadly force").  Therefore, it must be justified by a countervailing

16  government interest.  *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (holding

17  intermediate force requires governmental interest).

18              **b.     The Government Interest Was Minimal.**

19        The Court determines the governmental interest in using the force by considering the three

20  *Graham* factors.  That is, whether the "'totality of the circumstances' justifies the force used,

21  examining particularly [1] the severity of the crime at issue, [2] whether the suspect poses an

22  immediate threat to the safety of the officers or others, and [3] whether he is actively resisting

23  arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396 (quoting *Tennessee v.

24  Garner*, 471 U.S. 1, 8-9 (1985)).  As all of these factors weigh in favor of Plaintiffs, the Court

25  cannot find as a matter of law that the governmental interest justified Kuhn's use of force.

26              **i.     Severity of the Crime.**

27        Kuhn argues that the severity of Carver's crime was felony domestic violence.  Armas told

28  the officers that Carver had hit him in the head several times with a phone and television remote,

United States District Court
Northern District of California

and Armas had a black eye.  Plaintiffs do not refute this characterization, but instead urge that a reasonable jury could find that Carver's arrest was unlawful due to conflicting evidence in the officers' possession.  Carver was not charged with a crime at all, let alone a felony.  When officers arrived, Armas and Carver were separated, with Armas outside the house and Carver alone inside. Armas stated that the incident had occurred the previous day.  Carver was dressed in sweatpants and a t-shirt.  There is little to suggest that the nature of the crime warranted a heightened use of force.  *Cf. Smith v. City of Hemet*, 394 F.3d 689, 702-03 (9th Cir. 2005) (finding domestic abuse was not particularly severe crime where husband and wife were physically separated and husband was clad in his pajamas).

Kuhn states that Fink's crime was the misdemeanor offense of resisting, delaying, or obstructing a peace officer, but at the time of the dog bite, Kuhn believed Fink was engaged in a struggle with police that was some kind of felony.  Plaintiffs dispute that Fink committed any crime, and they point out that Kuhn saw Fink run past him toward the house prior to the struggle. Fink was released at the scene with a citation.  The fact that Fink committed, at most, a misdemeanor, weighs in favor of Fink and against Kuhn for the use of force employed by Kuhn.

### ii.      Immediate Threat to Officers.

The Court next considers whether Kuhn "reasonably perceived [Plaintiffs] as posing a threat" to officers or the public, even though Plaintiffs were ultimately not charged with any crimes.  *Nelson v. City of Davis*, 685 F.3d 867, 880 (9th Cir. 2012).  "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."  *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).

Carver did not pose an immediate threat to officers.  Although Armas had informed the officers that Carver possessed a firearm, he also told the officers that Carver kept the firearm under the mattress and that Carver would not use it.  More importantly, Kuhn saw Carver enter the front room wearing sweatpants and a t-shirt with only a small flare.  Kuhn saw that Carver had a cell phone in her right hand and that her left hand was empty.  There was no bulge along Carver's waist that would indicate a firearm.  Carver made no verbal threats.  Immediately after Kuhn backed away from the door, officers entered and pushed Carver down into the couch.  At the

1    moment Bodie bit Carver, two officers had control of Carver's left arm, and Carver's right arm

2    was trapped under her upper torso.  Three police officers were grabbing or pressing down on

3    Carver.  Any threat posed by Carver was under control with the pile of three police officers.

4        Fink likewise did not pose an immediate or serious threat to officers.  Kuhn saw as Fink

5    backed away from Gartner and Leonard with his hands up.  When Gartner and Leonard grabbed

6    Fink, Fink resisted handcuffing not by moving toward or attacking the officers, but by pressing his

7    hands into the ground.  Kuhn could see that Fink had no weapons because Fink wore gym shorts

8    and his hoodie was up over his head, exposing his waist and torso.  Like Carver, Fink made no

9    verbal threats prior to his arrest.

10        This factor, too, weighs in favor of Plaintiffs.

11                    **iii.    Resisting Arrest.**

12        There is no serious dispute that Plaintiffs resisted arrest.  The issue before the Court is

13   whether Plaintiffs' means and level of resistance weighs in favor of the use of the canine.

14   Resistance "runs the gamut from the purely passive protestor who simply refuses to stand, to the

15   individual who is physically assaulting the officer."  *Bryan*, 630 F.3d at 830.  Plaintiffs' conduct

16   falls on the passive end of the spectrum.

17        Carver stayed in her home out of fear of arrest.  She ignored officer commands to exit the

18   house.  When officers entered the house, Carver backed away.  She did not voluntarily comply

19   with orders to provide her hands for handcuffing.  However, Carver did not threaten or attack the

20   officers.  Instead, she said "why" and repeated that she was the one who had called the police.  A

21   jury could find that Carver's backward step was the natural result of facing three officers with

22   guns drawn and a barking police canine at her door rather than an attempt to flee the scene.  A jury

23   could also find that Carver was not given sufficient time or was unable to comply with orders to

24   provide her hands for cuffing.

25        Fink attempted to wiggle away when Hookston and Gartner grabbed onto his arms for

26   handcuffing.  Once on his knees, Fink ignored the instructions to provide his hands and instead

27   tried to press his hands into the ground.  Fink did not try to flee the scene—the officers' chief

28   complaint was that Fink entered, not left, the scene.  Fink shouted "excuse me" and "this is my

United States District Court
Northern District of California

13

sister's house" prior to the dog bite, not threats.

Less violent means were likely available to effect the arrests. Carver was pinned down by three police officers and cuffed by a fourth, whose combined efforts surely could have completed an arrest. Fink was flanked by two police officers, each of whom had a hold on one of Fink's arms. Kuhn may have been able to defuse the situation by warning Fink that he would be bitten if he continued to resist. Instead, Kuhn sicced Bodie on Fink without warning.

This factor therefore weighs in favor of Plaintiffs.

### c. The Balance of the Interests Indicates Excessive Force.

In comparing the serious intrusion of Plaintiffs' rights against the minimal governmental interest in use of the canine, a reasonable jury could find that Kuhn's use of the canine constituted excessive force. Lesser uses of force remained available to subdue the Plaintiffs, and Kuhn did not provide adequate warnings prior to using the canine.

### 2. Kuhn Is Entitled to Qualified Immunity Against Fink's Excessive Force Claim, But Not Carver's.

Defendants argue that Kuhn is entitled to qualified immunity on Plaintiffs' Fourth Amendment claims regarding Kuhn's use of the canine. According to Defendants, Kuhn's use of the canine to bite and control Plaintiffs was objectively reasonable in light of the information available to Kuhn, and, therefore, was lawful under the Fourth Amendment.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate any clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The privilege is an immunity from suit rather than a mere defense to liability. *Id.* at 232. Therefore, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

United States District Court
Northern District of California

14

United States District Court
Northern District of California

1  Because qualified immunity is an affirmative defense, the burden of proof initially lies with the

2  official asserting the defense.  *Harlow*, 457 U.S. at 812.

3        To determine the applicability of qualified immunity, a court must engage in a two-

4  pronged inquiry.  *Smith v. Schwarzenegger*, 137 F. Supp. 3d 1233, 1240 (E.D. Cal. 2015).  First, a

5  court must ask the threshold question: "Taken in the light most favorable to the party asserting the

6  injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Saucier v.*

7  *Katz*, 533 U.S. 194, 201 (2001) (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)). Second, if yes,

8  the court "must determine whether the law governing the official's conduct was clearly established

9  at the time the challenged conduct occurred."  *Mendoza v. Block*, 27 F.3d 1357, 1360 (9th Cir.

10  1994).

11        **a.     A Reasonable Jury Could Find that Kuhn's Use of the Canine Violated**

12               **Carver's Clearly Established Constitutional Rights.**

13        The Court first considers whether the contours of the rights were clearly established, "in

14  light of the specific context of the case, [and] not as a broad general proposition."  *Saucier*, 533

15  U.S. at 201.  A right is "clearly established" "[i]f the only reasonable conclusion from binding

16  authority were that the disputed right existed," such that government officials "would be on notice

17  of the right and would not be qualifiedly immune if they acted to offend it."  *Blueford v. Prunty*,

18  108 F.3d 251, 255 (9th Cir. 1997).

19        The fact that no case has found a constitutional violation under the exact circumstances

20  alleged does not imply that the right is not clearly established.  *Id.*  In an "obvious case," a right

21  may be clearly established "without a body of relevant case law."  *Koistra v. Cnty. of San Diego*,

22  310 F. Supp. 3d 1066, 1082 (S.D. Cal. 2018) (quoting *Maxwell v. Cnty. of San Diego*, 708 F.3d

23  1075, 1083 (9th Cir. 2013)).  The Ninth Circuit has held, for instance, that "no particularized case

24  law is necessary for a deputy to know that excessive force has been used when a deputy sics a

25  canine on a handcuffed arrestee who has fully surrendered and is completely under control."

26  *Mendoza*, 27 F.3d at 1363.  However, officers are "not charged with predicting the future course

27  of constitutional law."  *Blueford*, 108 F.3d at 255.  "[E]xisting precedent" must have placed the

28  question of excessive force "beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 305, 308 (2011).

In this case, Kuhn argues that there is no clearly established precedent that could have put him on notice that use of the canine on Carver was unreasonable. Kuhn offers four cases which he claims support the use of the canine: *Hughes v. Rodriguez*, 31 F.4th 1211 (9th Cir. 2022); *Hernandez v. Town of Gilbert*, 939 F.3d 739 (9th Cir. 2021); *Mendoza*, 27 F.3d 1357; and *Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003). All of these cases involve an escalation of tactics and a warning that the suspect may be bitten by a police dog that was absent here.

In *Hughes*, the Ninth Circuit found that the officer was not entitled to qualified immunity for post-handcuff dog bites. 31 F.4th at 1223-24. However, the court stated that, had the officer's "alleged unconstitutional conduct stopped at the use of the dog to subdue [the plaintiff], he would certainly be entitled to qualified immunity under our precedents." *Id.* at 1223. Prior to using the dog, the plaintiff—a fugitive who had fled from a highway work crew—was ordered to come out of a house by use of a loudspeaker. *Id.* at 1216. Defendants lawfully entered the house and ordered the plaintiff to come out or get bitten by a police dog. *Id.* at 1217. Bodycam video showed the police dog knock the plaintiff into the hallway, where he struggled with officers. *Id.* This case does not aid Kuhn: In *Hughes*, qualified immunity was denied because the plaintiff claimed the dog bites continued after he was handcuffed. Kuhn's bodycam footage showed that Carver was subdued by three other officers, such that the dog bite may have been mere pain infliction. Kuhn waited only seconds after Carver was knocked to the couch before he deployed the canine. Additionally, Kuhn did not warn Carver that she may be bitten.

In *Hernandez*, the Ninth Circuit affirmed application of qualified immunity to an officer who released his canine to subdue a noncompliant suspect. 939 F.3d at 741. In that case, the suspect had fled the scene of a crime and engaged in a police chase, refused commands to exit his vehicle, and resisted lesser force. *Id.* The "lesser force" deployed by the officers included multiple control holds followed by pepper spray. *Id.* at 742. Officers warned the plaintiff at least five times that he would be bitten if he did not exit his vehicle. *Id.* No such warnings or escalation of force were deployed here. Kuhn warned Carver that he would send in the canine to find her unless she came out, but Carver did then come out from her hiding spot. Kuhn did not wait for the three officers on top of Carver to grab her arms to be handcuffed before using the

canine.

In *Mendoza*, the Ninth Circuit held that an officer's use of a canine was objectively reasonable where the plaintiff was fleeing arrest for a bank robbery.  27 F.3d at 1362.  The plaintiff hid in the bushes on private property despite warnings that he would be bitten if he did not come out.  *Id.*  Additionally, the officers believed that the plaintiff was armed and that the plaintiff was a danger to the officers and the property owners.  *Id.*  Here, Defendants have presented no evidence that Carver was fleeing the scene of a crime or presented a danger to anyone at the moment Kuhn deployed Bodie.  Carver was in full view in the entryway to her own home, with her hands visible, and with no indications of a gun on her person.

In *Miller*, the Ninth Circuit held that an officer who used a dog to bite and hold a fleeing suspect for up to one minute did not violate the suspect's Fourth Amendment rights.  340 F.3d at 960.  The suspect had warrants for a felony and had fled from law enforcement officials into the woods at night.  *Id.* at 966.  The police had pursued the suspect's vehicle and signaled with emergency lights, pursued the suspect on foot, and warned the suspect that they would send a dog to find him if he did not surrender.  *Id.* at 967.  The court found that use of a canine was "particularly well suited" to the situation, which involved tracking a known felony suspect through dark and dangerous terrain.  *Id.*  Here, in contrast, Carver was not hiding in the dark woods but was standing in her well-lit front room.  Unlike in *Miller*, the canine was not used to prevent Carver from fleeing or ambushing the officers.

Plaintiffs cite only *Hernandez*, discussed above, to rebut Kuhn's case law.  They also emphasize that Kuhn directed Bodie to bite Carver within nine seconds of other officers making physical contact.

The Court agrees with Plaintiffs that, as discussed above, the cases cited by Defendants support the existence of a clearly established right to not be bitten by a police canine when under officer control.  Viewed in the light most favorable to Carver, the facts are that she was unarmed, pinned down by three police officers, and not attempting to flee.  Under these circumstances, no reasonable police officer could believe that it was lawful to direct a canine to bite Carver.  Kuhn is not entitled to qualified immunity as to the dog bite against Carver.

**b.      Plaintiffs Have Not Met Their Burden to Show that Kuhn Violated Fink's Clearly Established Rights.**

Unlike Carver, Fink was not subdued at the time of the dog bite.  Fink was resisting two officers who were ordering Fink to relinquish his hands.  Even though use of a canine bite may have been excessive force under the circumstances, Plaintiffs have pointed to no case law which would have warned Kuhn that use of a canine was unreasonable.

Defendants, in contrast, have pointed to a number of cases which affirm that use of a canine on a resisting subject is permitted.  Case law did not place such use "beyond debate."  Kuhn is thus entitled to qualified immunity as to use of the canine against Fink.

**D.      Genuine Issues of Material Fact Remain as to Plaintiffs' State Law Claims.**

Defendants argue that Plaintiffs' state law claims for negligence, battery, and violation of the Bane Act, Cal. Civ. Code § 52.1, fail because (i) Kuhn's use of force was reasonable; (ii) Plaintiffs cannot show that Kuhn intentionally interfered with their constitutional rights; and (iii) Kuhn is entitled to immunity under state law.

As discussed above, there are genuine issues of material fact regarding whether Kuhn's use of force was reasonable.  Therefore, Kuhn's motion is denied on this basis.  For the following reasons, Defendants' remaining arguments fail.[1]

**1.      Plaintiffs Have Established Genuine Issues of Fact to Support the Intent Element of Their Bane Act Claims.**

The Bane Act, Cal. Civ. Code § 52.1, "provides a cause of action for violations of a plaintiff's state or federal civil rights committed by 'threats, intimidation, or coercion.' " *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (quoting *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014)).  Public officials who allegedly interfere with those rights are not entitled to qualified immunity.  *Id.* at 1040-41.  However, a plaintiff asserting a Bane Act violation must make a showing of "specific intent," meaning that the defendant "intended not only the force, but its unreasonableness."  *Id.* at 1045 (quoting *United States v. Reese*, 2 F.3d 870,

---

[1] Defendants also contend that Plaintiffs forfeited their negligence and battery claims by not responding to their motion with regard to those claims.  This contention is meritless.  Plaintiffs spend much of their opposition and cross-motion addressing the "reasonableness" of the force used, which is the basis of Defendants' motion as to those claims.

United States District Court
Northern District of California

1  885 (9th Cir. 1993).  A plaintiff can show specific intent by demonstrating that the defendant acted

2  with "reckless disregard for a person's constitutional rights."  *Id.*

3      Defendants contend that there is no evidence Kuhn acted with the intent to deprive

4  Plaintiffs of any rights.  Plaintiffs respond that there is "substantial evidence" because (i) officers

5  "made no effort to ascertain the veracity of Gary Armas' claim that Ms. Carver assaulted him"; (ii)

6  the officers threatened Carver with "deadly force" via guns and the police canine; (iii) Kuhn

7  ordered Bodie to attack Carver after she was under restraint; and (iv) Kuhn ordered Bodie to attack

8  Fink without justification.

9      The Court disagrees with Plaintiffs' characterization that the officers did not attempt to

10  determine if Armas was telling the truth about the assault.  The officers repeatedly attempted to

11  speak with Carver to investigate the complaint.

12      However, a reasonable jury could find that Kuhn acted with specific intent to deprive

13  Carver of her Fourth Amendment rights by unlawfully entering her home and by using Bodie to

14  bite and hold Carver after three other officers were restraining or attempting to restrain Carver.  A

15  reasonable juror watching Kuhn's BWC video could determine that Kuhn acted with the

16  subjective intent to inflict pain beyond what was reasonable in overcoming Carver's resistance.

17      A reasonable jury could also find that Kuhn acted with specific intent to violate Fink's

18  rights by directing Bodie to bite and hold Fink during his arrest.  Kuhn did not announce that he

19  had a police canine or warn Fink that he may be bitten if he did not comply.  While Plaintiffs have

20  failed to identify case law indicating that Kuhn's use of force was objectively unreasonable in

21  violation of clearly established law for qualified immunity purposes, a jury watching Kuhn's

22  BWC video could find that Kuhn acted with the subjective intent to cause pain to Fink rather than

23  to assist in effecting his arrest.  Because subjective intent matters for liability under the Bane Act,

24  summary judgment in favor of Kuhn is inappropriate.

25      **2.      Kuhn Is Not Entitled to Immunity Under Cal. Gov. Code § 845.8(b) or Cal.**
        **Gov. Code § 820.4.**

26

27      Kuhn next argues that he is entitled to immunity against Plaintiffs' state law claims

28  pursuant to California Government Code sections 845.8(b) and section 820.4.  Plaintiffs very

United States District Court
Northern District of California

briefly oppose on the basis that they were not resisting arrest at the time of the dog bites.

California Government Code § 845.8(b) provides that "[n]either a public entity nor a public employee is liable for: . . . (b) Any injury caused by: . . . (3) A person resisting arrest." Cal. Gov. Code § 845.8(b)(3). Section 845.8(b)(3) is inapplicable to cases involving injury to persons resisting arrest. *Hermosillo v. Cnty. of Orange*, 562 F. Supp. 3d 802, 818 (C.D. Cal. 2021). Because Carver and Fink allege they were injured, rather than the cause of injury to other persons, Kuhn is not entitled to immunity under this statute.

Section 820.4 provides that "[a] public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law." Cal. Gov. Code § 820.4. The section does not confer immunity on officers who use unreasonable force during an arrest. *See* Blankenhorn v. City of Orange, 485 F.3d 463, 487 (9th Cir. 2007) (noting "it has long been established that this provision does not apply to officers who use unreasonable force in making an arrest"); *Atabekova-Michaelidis v. City of Los Angeles*, No. 222CV05620MCSMAA, 2023 WL 8043551, at *8 (C.D. Cal. Aug. 14, 2023) (denying finding of immunity at summary judgment stage because triable issue remained as to reasonableness of use of force). Because, here, the reasonableness of Kuhn's use of force is at issue, Section 820.4 does not apply.

Accordingly, Kuhn's motion for summary judgment as to the state law claims is denied.

**E.     The Officers' Entry Into Carver's Home Violated the Fourth Amendment.**

The right to "retreat into [one']s own home and there be free from unreasonable governmental intrusion" is at the "very core" of the Fourth Amendment. *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *LaLonde v. County of Riverside*, 204 F.3d 947, 954 (9th Cir. 2000) (quoting *Payton v. New York*, 445 U.S. 573, 590 (1980)).

The parties agree that Kuhn and the other police officers did not have a warrant to enter Carver's home or to arrest Carver. However, Kuhn argues that a warrant was unnecessary because Armas consented to entry and because exigent or emergency circumstances existed. Plaintiffs contend that Armas did not consent to entry and, even if he had, Carver did not. Plaintiffs further

United States District Court
Northern District of California

deny any exigencies or emergency.

### 1.     Carver Expressly Refused Consent to Warrantless Entry.

Warrantless entry is permitted where the officers obtain "consent to enter from a third party who has common authority over the premises." *Bonivert v. City of Clarkston*, 883 F.3d 865, 874 (9th Cir. 2018). Armas resided at the home. An objectively reasonable officer would find that, when Armas offered his keys to Corp. Johnson without prompting, Armas clearly consented. The issue before the Court, therefore, is whether Carver was also required to give consent before the officers could enter the home.

Carver points to *Georgia v. Randolph*, 547 U.S. 103 (2006) for the proposition that officers may not enter a home without a warrant on the basis of consent where a physically present co-occupant does not consent to entry. In *Randolph*, officers first asked a husband for consent to search the marital home for drug paraphernalia. *Id.* at 107. After the husband refused, officers asked the wife, who gave consent. *Id.* The husband later sought to suppress introduction of evidence obtained from the warrantless search made over his objection. *Id.* The Supreme Court agreed with the husband and held that a search conducted pursuant to a co-tenant's consent was invalid as to an objecting co-tenant. *Id.* at 121. In doing so, the Court drew a "fine line," noting that a "potential objector, nearby but not invited to take part in the threshold colloquy, loses out" on his right to refuse consent. *Id.*

Subsequent decisions have clarified that a co-tenant's refusal of entry need not be verbal. In *Bonivert v. City of Clarkston*, the Ninth Circuit determined that the plaintiff expressly refused entry by locking the door to his house as officers approached and by attempting to close another door on the officers. 883 F.3d at 875. The Ninth Circuit considered officer testimony that the plaintiff "didn't want to talk" and "didn't want contact" to confirm that the plaintiff's "refusal of consent was 'express.' " *Id.* at 876.

Here, Carver shut and locked the front door to the residence when police arrived. Carver's action of closing and locking the door parallels that of the plaintiff in *Bonivert*, whose decision to lock and close the door was considered to be an "express refusal." *See id.* at 876. By closing and locking the door, Carver "engaged in affirmative conduct to prevent the police from entering [her]

21

home." *See id.* at 876 n.9.

Carver also clearly indicated that she did not want contact with police by ignoring the officers' knocks and hanging up the phone when Officer Garcia identified himself as the caller. *See id.* at 876 (observing that officers subjectively understood plaintiff did not want contact with them and which left "no doubt" that his refusal was "express"). Carver returned to the front door only when threatened with the canine, and even then Carver did not speak with the officers. She thus made clear that the officers were not welcome into the house.

Accordingly, Armas's consent was negated by Carver's refusal. The officers, including Kuhn, violated Carver's Fourth Amendment rights by entering and arresting Carver inside her home without a warrant.

### 2.        The Exigency Exception Does Not Apply.

An officer claiming exigent circumstances justified a warrantless arrest and entry inside a home faces a "heavy burden." *LaLonde*, 204 F.3d at 957. The exigency exception to the warrant requirement exists only where "the needs of law enforcement [are] so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Struckman*, 603 F.3d at 743. The officer must show that he has "both probable cause to believe that a crime has been or is being committed and a reasonable belief that [his] entry is 'necessary to prevent … the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.' " *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984)) (ellipses in original). The need to prevent harm to the officer or other persons may constitute an exigency. *Struckman*, 603 F.3d at 743. No exigency was present here.

### a.        Officers Had Probable Cause to Arrest Carver.

Defendants argue that the officers had both "reasonable suspicion" and "probable cause" to seize Carver. Reasonable suspicion is irrelevant in this context. *Struckman*, 603 F.3d at 743. Probable cause does not excuse a warrantless arrest inside a home. *Id.* However, probable cause is a prerequisite to application of the exigency exception.

"Probable cause exists when, under the totality of the circumstances known to the arresting

officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." *United States v. Ortiz-Hernandez*, 427 F.3d 567, 573 (9th Cir. 2005) (quoting *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999)) (substitution in original). "When assessing probable cause, courts must consider the totality of the circumstances known to the officers at the time." *Hill v. City of Fountain Valley*, 70 F.4th 507, 515 (9th Cir. 2023). If "the material, historical facts are not in dispute, and the only disputes involve what inferences properly may be drawn from those historical facts," the Court may determine whether probable cause existed. *Peng v. Mei Chin Penghu*, 335 F.3d 970, 979-80 (9th Cir. 1993). Kuhn's subjective beliefs as to whether Carver had committed a felony are irrelevant. *Struckman*, 603 F.3d at 740.

Defendants claim that officers had probable cause to believe that Carver had violated California Penal Code § 273.5, which makes it a felony to "willfully inflict[] corporal injury resulting in a traumatic condition upon . . . [t]he offender's cohabitant or former cohabitant." Cal. Pen. Code § 273.5(a), (b)(2). A "traumatic condition" includes an "external or internal injury. . . whether of a minor or serious nature, caused by a physical force." Cal. Pen. Code § 273.5(d).

Armas told the officers that Carver had struck him with her fist, television remote, and cordless phone. Armas had a visible black eye indicating an "external injury" of a "minor or serious nature, caused by a physical force." *See* Cal. Pen. Code § 273.5(d). Upon the officers' arrival, Armas spoke with Officer Garcia and gave his version of events, whereas Carver hid because she feared being arrested for domestic violence.

A reasonable officer assessing the totality of the circumstances would have probable cause to believe that Carver had violated California Penal Code § 273.5 by causing Armas' injury.

### b. No Exigency Existed.

Even where probable cause exists, warrantless entry to search and seize a resident of a home is unlawful absent an exigency. *Payton*, 445 U.S. at 588. Considering the facts in the light most favorable to Carver, Carver posed no threat of harm to Officer Kuhn or other officers. While the officers were aware that Carver had a firearm in the home, Carver did not have a gun in her hands nor a bulge in her waist indicating that she was carrying the firearm on her. Armas had told the officers that Carver would not use the firearm. And, at the time Kuhn entered Carver's home,

1    multiple other officers had surrounded, grabbed, and shortly pinned Carver.  To the extent Carver

2    may have created an exigency by physically resisting the officers, the officers first created the

3    exigency by unlawfully entering Carver's home.  *See United States v. Lundin*, 817 F.3d 1151,

4    1158 (9th Cir. 2016) (holding "exigent circumstances cannot justify a warrantless search when the

5    police 'create the exigency by engaging … in conduct that violates the Fourth Amendment")

6    (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)).

7            Nor was Carver making an escape.  Although Defendants characterize Carver's backward

8    step as "backing away dangerously," Carver was contained in her home and surrounded by

9    officers.  The evidence does not support an inference that, had the officers taken time to obtain a

10   warrant, Carver would have fled the scene.

11                    **c.        The Emergency Aid Exception Does Not Apply.**

12           The emergency aid exception is a subset of the exigent-circumstances exception.  It applies

13   where "the officers have an objectively reasonable basis to believe there is an immediate need to

14   protect the lives or safety of themselves or others."  *United States v. Snipe*, 515 F.3d 947, 953 (9th

15   Cir. 2008) (quoting *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006)).  An officer

16   relying on the emergency aid exception must have "reasonable grounds for suspecting a medical

17   or other life-threatening emergency," such as a 9-1-1 caller's hysterical screaming, the smell of

18   combustible fumes, reports of a shooter, or a screaming potential domestic violence victim.  *See*

19   *Hopkins v. Bonvicino*, 573 F.3d 752, 766 (9th Cir. 2009) (explaining circumstances in which Ninth

20   Circuit has found reasonable grounds to suspect an emergency).

21           Kuhn argues that it would have been unreasonable for him to wait outside while Carver

22   physically resisted other officers, and that his entry into the home was necessary to prevent harm

23   to an occupant or his fellow officers.  This argument is objectively unreasonable.  Kuhn entered

24   the residence immediately following his fellow officers, who already had Carver surrounded.

25   Kuhn saw that Carver had a cell phone in one hand and that her other hand was empty.  Kuhn had

26   no basis to believe that an emergency required his aid.  *See Sandoval v. Las Vegas Metro. Police*

27   *Dep't*, 756 F.3d 1154, 1164 (9th Cir. 2014) (finding emergency exception did not apply where

28   officer did not articulate "particularized or imminent threats of violence" to the arresting officers).

**3.      Kuhn Is Not Entitled to Qualified Immunity for Carver's Unlawful Entry and Arrest Claims.**

The right against warrantless entry and arrest inside one's home in the absence of an exigency was clearly established at the time of the incident.  *See, e.g.*, *Payton*, 445 U.S. at 588. That there is typically no exigency where the victim in a domestic violence incident is outside the home was also clearly established.  *See United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005) ("When the domestic violence victim is still in the home, circumstances may justify an entry pursuant to the exigency doctrine.")

Additionally, it was clearly established that a co-habitant who closes and locks the entrance to a home upon the arrival of police declines consent to enter.  *Randolph* was decided nearly fourteen years before the conduct at issue, and *Bonivert* was decided two years before the conduct at issue.  Accordingly, Armas's consent was not valid as to Carver under clearly established law at the time of the incident.

Kuhn's final qualified immunity argument is that there is no clearly established law that prohibits an officer from entering a residence after other officers have already unlawfully entered the residence.  Kuhn points out that four officers entered before him, and that Carver was engaged in a struggle with those officers at the time of his entry.  Plaintiffs respond that it is well-established that police cannot create an exigency by acting unlawfully and then use the exigency to enter a home without a warrant.  The Court agrees with Carver that, under clearly established law, officers may not rely on unlawful activity by other officers to create an exigency or to enter a residence without a warrant.  *See Lundin*, 817 F.3d at 1158; *Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067, 1074 (9th Cir. 2018) (noting that "absent a warrant, consent, or exigent circumstances, there is a duty *not* to enter") (emphasis in original).

Even if Kuhn were correct that an officer could reasonably believe that he may enter a home without a warrant, consent, or exigent circumstances so long as other officers have done so first, the entry here is attributable to all five officers.  Kuhn's BWC video shows that the officers entered in single file, without delay.  Kuhn moved to the back of the line with Bodie, but he immediately entered behind the fourth officer.  The officers held or pushed open the screen door between each officer's entry.  (*See* Kuhn BWC at 02:04-02:09 (showing all officers entering

25

1  within five seconds of each other so that the door had no time to swing shut).)  The entry of all

2  officers was as near to simultaneous as possible given the size of the doorway, and thus all were

3  responsible.

4       Accordingly, Kuhn is not entitled to qualified immunity for the warrantless entry into

5  Carver's home.  The Court grants Carver's motion for partial summary judgment as to the

6  unlawful entry claim.

7       **4.**      **Carver's Claim Regarding the Officers' Search of Carver's Home and Seizure of the Firearm Was Not Sufficiently Pleaded in the Complaint.**

8

9       Carver contends that, even if her arrest was lawful, the subsequent search of her home and

10  seizure of her firearm was not lawful because the firearm was outside of the immediate vicinity of

11  her arrest and had no connection to any crime.  Defendants respond that Carver did not allege an

12  unlawful seizure of the firearm in her complaint, and that, even if it had been pleaded, Kuhn is not

13  liable.

14       In order to state a claim under Rule 8, a plaintiff must provide the defendant with "fair

15  notice of what the plaintiff's claim is and the grounds upon which it rests."  *Pickern v. Pier 1*

16  *Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006).  If a "complaint does not include the

17  necessary factual allegations to state a claim, raising such claim in a summary judgment motion is

18  insufficient to present the claim to the district court."  *Pac. Coast Fed'n of Fishermen's*

19  *Associations v. Glaser*, 945 F.3d 1076, 1086-87 (9th Cir. 2019) (quoting *Navajo Nation v. U.S.*

20  *Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008)).

21       Carver points to the following language in her Complaint for putting the search of her

22  home and seizure of her firearm at issue:

23          40. At all times relevant to this complaint, it was the policy, practice and custom of CITY OF PLEASANT HILL, acting through their policymakers and agents, to violate the

24          Fourth Amendment to the Constitution as described in this complaint.

25          41. Those violations which constituted the policy of CITY OF PLEASANT HILL, and DOES 1 through 20, included, but were not limited to, the use of unreasonable,

26          unjustified, and/or excessive force and engage in unlawful seizures based upon unlawful policies.

27

28  (Dkt. No. 1, Compl., ¶¶ 40-41.)

United States District Court
Northern District of California

These paragraphs are general and formulaic recitations of the elements of Carver's cause of action against the City. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (3007) (holding "a formulaic recitation of the elements of a cause of action will not do" under Rule 8). Carver does not mention the words "firearm" or "search" anywhere in the Complaint, whereas she repeatedly references the seizure of her person. (*E.g.*, Compl., ¶¶ 4, 21, 36.) The Complaint does not provide notice to Defendants that Carver contested the legality of the home search and firearm seizure. *See Pickern*, 457 F.3d at 969 (affirming denial of summary judgment where plaintiff did not sufficiently plead grounds for claim). Accordingly, Carver's motion for partial summary judgment on this issue is denied.

**F.      The Court Denies Fink's Motion for Partial Summary Judgment Because Genuine Issues of Material Fact Remain As to Whether Fink Was Unlawfully Arrested, and Fink's Claim Fails as to Kuhn.**

Fink limited his Fourth Amendment claims to Kuhn, with a *Monell* claim against the City for supervisory liability. Fink concedes that he does not contend Kuhn arrested him. (Dkt. No. 51, Opp. and Cross-Mot. Summ. J., at 8 ("neither Plaintiff contends that *Kuhn* is responsible for their respective arrests; only defendant City. . ."). Accordingly, Kuhn's motion for summary judgment is granted with respect to Fink's unlawful arrest claim.

Neither party addresses the City's policies and procedures. Instead, the City and Fink focus on the lawfulness of the arrest by the arresting officers. Fink's arrest was unlawful if no probable cause existed at the time he was arrested. *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005).

The City contends that probable cause existed to believe that Fink violated California Penal Code § 148(a)(1). That statute provides that "[e]very person who willfully resists, delays, or obstructs any. . . peace officer. . . in the discharge or attempt to discharge any duty of his or her office or employment" commits a misdemeanor. Cal. Pen. Code § 148(a)(1). The City points to three actions by Fink that allegedly support probable cause: Fink's attempted entry to Carver's home, his delay in retreating upon command, and his physical resistance to handcuffing. Of these three actions (or inactions), only his attempted entry into the home and alleged delay in retreating occurred before the seizure.

1    Fink argues that at the time Officer Gartner and Sergeant Leonard began handcuffing Fink,

2    he had committed no crime.  He points out that Section 148 does not criminalize resistance to

3    unlawful activity, and he contends that Officer Gartner and Sergeant Leonard were not acting

4    lawfully at the time of the arrest.  *See People v. Southard*, 62 Cal. App. 5th 424, 434-35 (2021)

5    (holding that defendant cannot be convicted of resisting an unlawful arrest under Section 148;

6    collecting cases).

7    Considering the evidence before the Court, a reasonable jury could determine that the

8    officers lacked probable cause to arrest Fink.  The Gartner BWC video shows Gartner moving

9    toward Fink as Fink opens the screen door, telling Fink to back up and pressing against Fink's

10   chest, and then turning Fink around and ordering Fink to put his hands behind his back while Fink

11   says "this is my sister's house" and "excuse me."  Sergeant Leonard's BWC video shows Leonard

12   following behind Gartner, telling Fink to stay out of the house, and telling Fink to put his hands

13   behind his back.  Neither Gartner nor Leonard tell Fink that he is under arrest, what he is under

14   arrest for, or attempt to talk to Fink prior to arresting him.

15   It is unclear what, if anything, Fink did to resist, delay, or obstruct the officers at the time

16   of his arrest.  Fink resisted being placed into handcuffs, but his resistance is only unlawful if the

17   officers' conduct in arresting Fink was lawful.  *Southard*, 62 Cal. App. 5th at 435.  A jury could

18   reasonably find that it was not.

19                                   **PLAINTIFFS' DELAY IN FILING**

20   On June 30, 2023, the parties entered a stipulation to modify the briefing schedule for their

21   cross-motions for summary judgment.  (Dkt. No. 49.)  Under the stipulated modified briefing

22   schedule, Plaintiffs agreed to file their Opposition to Defendants' Rule 56 motion and their Rule

23   56 cross-motion by July 14, 2023.  Plaintiffs filed their Opposition and Cross-Motion a day late,

24   on July 15, 2023.  (Dkt. No. 51.)

25   Plaintiffs did not request leave to file an untimely submission, and they did not show good

26   cause for their delay.  The Court ADMONISHES counsel that it does not look favorably on

27   counsel's untimely submission, and although the Court will entertain Plaintiffs' Opposition and

28   Cross-Motion in this instance, it will not do so in the future absent a showing of good cause.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CONCLUSION**

Based on the foregoing, the parties' motions are GRANTED, IN PART, AND DENIED, IN PART, as follows:

- Defendant Kuhn is entitled to qualified immunity regarding Plaintiff Fink's claim under 42 U.S.C. Section 1983 for excessive force;

- Defendant Kuhn is not entitled to qualified immunity or state law immunities on the Plaintiffs' remaining claims;

- The Plaintiffs' claims for unlawful arrest are dismissed as against Defendant Kuhn, but not as against Defendant City;

- Genuine issues of material fact remain regarding whether probable cause existed for Plaintiff Fink's arrest;

- The warrantless entry into and arrest inside of Plaintiff Carver's residence violated the Fourth Amendment as a matter of law;

- Plaintiff Carver's motion for partial summary judgment regarding the seizure of her firearm fails because she did not adequately plead that claim; and

- Genuine issues of material fact remain regarding the reasonableness of Defendant Kuhn's use of force against Plaintiffs for purposes of Plaintiff Carver's Section 1983 claim and for both Plaintiffs' state law claims.

Pursuant to the Court's bifurcation order, (Dkt. No. 29), trial will proceed in the first phase against Defendant Kuhn only.  The pending claims for the first phase of the trial are:

- Plaintiff Carver's Section 1983 claim for unreasonable force and unlawful entry into her residence in violation of the Fourth Amendment;

- Plaintiff Carver's negligence, assault, and battery claims as against Defendant Kuhn only;

- Plaintiff Carver's Bane Act claim as against Defendant Kuhn only;

- Plaintiff Fink's negligence, assault, and battery claims as against Defendant Kuhn only; and

- Plaintiff Fink's Bane Act claim as against Defendant Kuhn only.

29

The remaining claims against the City will be addressed, if necessary, in the second phase.

The parties are HEREBY ORDERED to appear for a Further Case Management Conference on Friday, March 22, 2024 at 11:00 a.m.  The parties shall submit a Joint Further Case Management Conference Statement no later than Friday, March 15, 2024.  In their joint statement, the parties shall set forth their proposed schedule for trial and the pretrial conference.  The parties shall be prepared to discuss any additional anticipated motion practice and status of settlement discussions.

**IT IS SO ORDERED.**

Dated: February 22, 2024

_____
JEFFREY S. WHITE
United States District Judge